RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0177p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVIAN WARREN,

*Defendant-Appellant.*

> No. 20-3045

─────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:17-cr-00122-1—John R. Adams, District Judge.

Argued:  April 22, 2021

Decided and Filed:  August 9, 2021

Before: WHITE, NALBANDIAN, and READLER, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Matthew Ahn, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Toledo, Ohio, for Appellant.  Rebecca C. Lutzko, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.  **ON BRIEF:**  Matthew Ahn, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Toledo, Ohio, for Appellant.  Kathryn G. Andrachik, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

NALBANDIAN, J., delivered the opinion of the court in which WHITE and READLER, JJ., joined.  NALBANDIAN, J. (pp. 11–14), also delivered a separate concurring opinion.

---

**OPINION**

---

NALBANDIAN, Circuit Judge. This case is déjà vu all over again. Davian Warren pled guilty to being a felon in possession of a firearm. The district court sentenced him to ten years in prison—the statutory maximum. We vacated that sentence, holding it substantively unreasonable, and sent the case back to the district court for resentencing. That second effort, which produced a 96-month sentence, is before us now.

Warren mounts two attacks on his new sentence. Like before, he argues his sentence is substantively unreasonable. But that's not all. This second time around, Warren says the government breached his plea agreement at his resentencing. And he's right. Looking to the plain meaning of the plea agreement, the government did not live up to its end of the bargain. So we **VACATE** Warren's sentence for a second time and **REMAND** his case for resentencing before a different district court judge.

I.

This case began after a grand jury indicted Warren for being a felon in possession of a firearm. Warren eventually pled guilty with the benefit of a written plea agreement. The agreement bound the parties to "recommend that the Court impose a sentence within" Warren's Guidelines range—which turned out to be 51 to 63 months. (R. 27, Plea Agreemnt at 4, PageID # 76; R. 38, Presentence Investigation Report at 16, PageID # 161.) And it prohibited either party from "*suggest[ing] in any way* that a departure or variance" from Warren's Guidelines range "is appropriate." (R. 27, Plea Agreement at 4, PageID # 76 (emphasis added).)

After Warren entered the plea agreement but before sentencing, the district court notified Warren that it was considering an upward variance. And the court was true to its word. After Warren's first sentencing hearing, the district court sentenced him to 120 months in prison—nearly doubling the high end of Warren's Guidelines range. Warren appealed. He said his sentence was substantively unreasonable because the district court relied exclusively on his

criminal history in varying upward by almost 60 months. *See United States v. Warren*, 771 F. App'x 637, 640 (6th Cir. 2019).

We agreed with him. We reasoned that "because the Guidelines already account for a defendant's criminal history," the district court's "extreme variance" based solely on Warren's criminal history was "inconsistent with the need to avoid unwarranted sentence disparities." *Id.* at 642 (quotations omitted). So we vacated Warren's sentence and remanded his case for resentencing.

After the case went back down, the district court again circulated a notice of possible upward variance. Then came Warren's resentencing. Early in the hearing, the court asked the parties to discuss the potential variance. Warren's attorney started off by urging the court to impose a Guidelines sentence because "all agreed that a guideline range was the appropriate sentence here." (R. 73, Tr. at 8, PageID # 444.)

After the court asked for the government's general position, the prosecuting attorney began by stating that she "wanted to clarify something that defense counsel brought up because she is asking the Court to have a standard of reliance upon this." (*Id.* at 27, PageID # 463.) The prosecuting attorney acknowledged the existence of a plea agreement, which "the government did enter" and which "the government has no intention of violating." (*Id.*) But she continued:

> [B]ecause defense counsel brought up that this is what was recommended to the Court, I want to make sure it's very clear to the Court that the government was aware of prior convictions. But the government does not normally have the benefit of the offense conduct surrounding those convictions. So in the two instances where the defendant has convictions for felonious assault or attempted felonious assault . . . at the time the government entered into the plea agreement, it did not know that both of those were not just convictions for felonious assault, that those actually arose out of actual shootings. . . . [T]here were two people that were shot at [in the first felonious assault]. . . . I believe [the second felonious assault] was a discharge at a vehicle which contained [Warren's] own family members. And there were three people inside of that car. So I just want to make sure that the Court is aware that the government did not have that information at the time that it entered into the plea agreement and *quite probably would have made different recommendations had it known that information*.

(*Id.* at 27–28, PageID # 463–64 (emphasis added).) Warren's attorney immediately objected and then raised another objection later. In her view, the government's argument suggested to the court that it "should not follow the plea agreement but should instead give Mr. Warren more time." (*Id.* at 28, PageID # 464.)

The district court disagreed with this characterization. It construed the government's comment simply as explaining "why and how it is they came about to enter the [plea] agreement." (*Id.*) And for her part, the prosecuting attorney later clarified that she was "not going to argue for a sentence higher than 63 months" because she was "bound by the plea agreement." (*Id.* at 30, PageID # 466.) She explained she made her prior remarks "because defense counsel raised an importance [sic] that this Court rely on the government's recommendation of that range." (*Id.*) She finished her remarks by repeating her earlier sentiment that "had the government had different information, perhaps it might have done something differently," arguing that it ultimately did "not matter" because the "government can only recommend at this point . . . a sentence within the guideline range." (*Id.*) And the court agreed with her—it did not view the prosecution's comments "as in any way repudiating the plea agreement." (*Id.* at 33, PageID # 469.)

After this back-and-forth, the district court sentenced Warren to 96 months in prison. The court began by explaining its reasons for this sentence. It listed many: Warren's excuse for his crime was not credible; his criminal record is extensive; his history involves not just carrying but firing guns and injuring people with them, including his own family; he fled police multiple times; previous sentences were ineffective at deterring him; and he had multiple violent altercations in prison, even paralyzing his own brother after badly beating him. The court also acknowledged that Warren had a difficult upbringing and had "done some positive things" while in custody. (*Id.* at 43, PageID # 479.) Still, in the court's view, there was "no reasonable argument that a guidelines sentence" would "protect the public, reflect the seriousness of the offense, [or] improve the offender's conduct and condition." (*Id.* at 46, PageID # 482.) The district court then followed up sentencing with a memorandum further explaining its decision.

Warren now challenges his new sentence. He raises two main arguments. First, he says the government breached his plea agreement by telling the court it would not have entered the

agreement had it known that Warren's felonious assault convictions involved shootings.  Warren says this breach warrants resentencing before a different judge.  And second, Warren argues that his sentence is substantively unreasonable.

Warren's first argument wins the day.  The government indeed breached his plea agreement.  And having concluded as much, we need not reach Warren's substantive-reasonableness challenge.  We therefore vacate Warren's sentence and, following our precedent, remand his case for resentencing before a different district court judge.

II.

Because Warren objected to the government's alleged breach, we review whether the government breached his plea agreement de novo.  *United States v. Ligon*, 937 F.3d 714, 718 (6th Cir. 2019).  "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."  *Santobello v. New York*, 404 U.S. 257, 262 (1971).  In other words, a defendant has a due process right to hold the government to the promises it made that induced him to plead guilty.  *Id.*; *see United States v. Barnes*, 278 F.3d 644, 648 (6th Cir. 2002).

We treat plea agreements like contracts.  *Ligon*, 937 F.3d at 718.  So we use "traditional principles of contract law" to interpret them, and we enforce them according to their literal terms.  *Id.* (quoting *United States v. Lukse*, 286 F.3d 906, 909 (6th Cir. 2002)).  But because defendants "waive[] certain fundamental rights" when they enter plea agreements, *Barnes*, 278 F.3d at 647–48, we construe ambiguities against the government, *United States v. Fitch*, 282 F.3d 364, 367 (6th Cir. 2002).  And we hold prosecutors to "meticulous standards of performance."  *United States v. Moncivais*, 492 F.3d 652, 662 (6th Cir. 2007) (quoting *United States v. Vaval*, 404 F.3d 144, 152–53 (2d Cir. 2005)).

To satisfy these high standards, the government must do more than pay lip service to its obligations—we forbid "not only explicit repudiation of the government's assurances" but also "end-runs around them."  *Id.* (quoting *United States v. Saxena*, 229 F.3d 1, 6 (1st Cir. 2000)).  Still, the government need not support a Guidelines sentence enthusiastically.  *United States v. Mason*, 410 F. App'x 881, 889 (6th Cir. 2010).  In the end, a line exists between "advocacy, on

one hand, and providing the district court with relevant factual information, on the other hand." *Moncivais*, 492 F.3d at 664.

A.

With these principles in mind, we turn to the alleged breach.  Recall that in exchange for Warren's guilty plea, the government agreed not to "suggest in any way" to the district court that a variance from Warren's Guidelines range was appropriate.  (R. 27, Plea Agreement at 4, PageID # 76.)  Warren says the government breached this promise by telling the court it "quite probably would have made different recommendations had it known" that Warren's felonious assault convictions involved him firing guns at people, including his own family.  (R. 73, Tr. at 28, PageID # 464.)

Warren is right.  Start with the plain language of the agreement, which in relevant part is broad.  *See United States v. Beals*, 698 F.3d 248, 256 (6th Cir. 2012).  To "suggest" something is "to mention [it] as something to think over," to "bring [it] to the mind for consideration," or "to propose [it] as a possibility." Webster's New World College Dictionary 1450 (Andrew N. Sparks et al. eds., 5th ed. 2020); *see also* Webster's Third New International Dictionary 2286 (2002) (defining "suggest" as "to mention . . . as a possibility," "put forward by implication," or "propose . . . as desirable or fitting").  That means the government here committed itself not to *in any way* "mention [a variance] as something to think over," "bring [a variance] to the mind for consideration," "propose" or "mention" a variance "as a possibility," or put a variance "forward by implication." Webster's New World College Dictionary 1450 (Sparks et al. eds., 5th ed. 2020); Webster's Third New International Dictionary 2286 (2002).

This was a sweeping promise.  And the government did not keep it.  The government told the court it likely would have made a different recommendation had it known Warren shot at multiple people, severely injuring one.  At the very least, this brought a variance forward by implication—the remark cast doubt on the adequacy of the Guidelines range and injected reservations about the plea agreement itself.  It relayed to the court that the government agreed to the plea with incomplete information and no longer felt a Guidelines sentence was appropriate.

And by undermining the Guidelines range as an appropriate sentence, the government "suggested" *in some way*, even if indirectly, that the court should vary.

The immediate context of the government's comments confirms as much. The government bookended its remarks with a description of the crimes Warren committed. So not only did the government say it probably would not agree to Warren's Guidelines range again if given the chance, but it told the court *why* it would not have agreed to it: Warren's felonious assault convictions involved him (1) shooting a man with a shotgun, hospitalizing him, and (2) firing a gun at a car carrying his sisters and niece. "At a minimum, by characterizing [Warren] as a dangerous criminal," the government "suggested in some way that a" variance was appropriate. *United States v. Heredia*, 768 F.3d 1220, 1234 (9th Cir. 2014). That's especially true because the district court already had access to the information the government relayed—it was in Warren's presentence report. *See id.* at 1231. So the government's conduct "undoubtedly constituted advocacy, because the government was not providing any new factual information to the district court." *Mason*, 410 F. App'x at 889.

Likewise, the broader context of the government's comment is equally damning. The government made its remarks after the court generally invited the parties to comment on whether it should impose a variance. Importantly, the prosecutor's comment was not prompted by a specific factual inquiry by the court. *See United States v. Carter*, 814 F. App'x 1000, 1007 (6th Cir. 2020) ("[P]rosecutors have a duty to tell the truth to courts and to respond to factual inquiries."). Instead, the prosecuting attorney independently chose to respond to the defense's argument that the government thought the Guidelines range was appropriate and thus that a variance was not. In other words, the government *specifically identified* the defense's advocacy for a Guidelines sentence as the basis for its comments, and it pointedly undermined the claim that it agreed the range was appropriate. That the prosecuting attorney repeated her views that the government was having second thoughts about the plea agreement even after defense counsel objected leaves little doubt as to the intent of the government's comments at sentencing.

The government cannot escape its duties under a plea agreement with a wink and a nod. *See Moncivais*, 492 F.3d at 662. Its obligation was to avoid suggesting *in any way* that a variance was appropriate. That is a broad promise—and we hold the government strictly to its

word. *United States v. Mandell*, 905 F.2d 970, 973 (6th Cir. 1990); *Moncivais*, 492 F.3d at 662. But here, the government failed to hold up its end of the bargain.

B.

The government's arguments to the contrary are unpersuasive. For instance, it argues it "repeatedly recommended a sentence within the Guideline range." (Appellee Br. at 17.) That's true. But it elides an important fact. Under the plea agreement, the government had an obligation beyond just "recommend[ing] that the Court impose a sentence within the range and of the kind" that the Guidelines set. (R. 27, Plea Agreement at 4, PageID # 76.) It also had an independent obligation to avoid "suggest[ing] in any way" that a variance was appropriate. (*Id.* at 4, PageID # 76.) And for the reasons above, it failed to do that.

Next, the government points out that the district court did not construe its comments as recommending a variance. The government is right that in response to Warren's objection to the government's statements, the district court noted, on the record, that it did not think the government was suggesting to the court that it "should not follow the plea agreement but should instead give Mr. Warren more time." (R. 73, Sentencing Tr. at 28, PageID # 464.) Nor did the district court view the government's statement as repudiating the plea agreement. There are a couple of ways we could view these remarks. On the one hand, we could construe them as a conclusion that the government did not, in fact, breach the plea agreement. We could alternatively or also view them as a type of harmlessness finding. But whichever road we take does not matter. As we have already explained, the government breached the plea agreement. And the Supreme Court in *Santobello* was clear that whether the government's breach actually influenced the sentencing judge is irrelevant. 404 U.S. at 262–63. Instead, "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id.* at 262.

The government also argues it "never made an express statement that the sentence was improper or that a variance was appropriate." (Appellee Br. at 21.) Even if true, that would not make a difference. The government did not commit itself to avoid making "an express statement" that a variance is appropriate. *See United States v. Danou*, 260 F. App'x 864, 868

(6th Cir. 2008) ("We will hold the Government to the promises it made, but we will not hold the Government to promises it *did not* make."). It instead undertook a much broader commitment not to "suggest in any way" that a variance is appropriate. And one can "suggest" something without explicitly referring to it. *See* Webster's Third New International Dictionary 2286 (2002) (defining "suggest" as to "put forward by implication").

Finally, the government relies on two cases in which the court found no breach. *See United States v. Wukoson*, 798 F. App'x 551 (11th Cir. 2020); *Mason*, 410 F. App'x at 885. But neither case involved a promise not to "suggest in any way" that a variance was appropriate. *See Wukoson*, 798 F. App'x at 553 (government argument promised only "to recommend" a sentence not higher than four years); *Mason*, 410 F. App'x at 885 (government promised "not to advocate for" a sentence longer than 240 months). And the defendants in neither *Wukoson* nor *Mason* objected at sentencing to the government's breach. *Wukoson*, 798 F. App'x at 557; *Mason*, 410 F. App'x at 888. So both had a higher wall to climb than Warren, who preserved his objection to the government's error. *See Puckett v. United States*, 556 U.S. 129, 141 (2009) (noting *Santobello*'s holding "that automatic reversal is warranted when objection to the Government's breach of a plea agreement has been preserved").

In short, the government breached Warren's plea agreement.

C.

Having concluded that the government breached the plea agreement, we turn to the remedy. Warren requests resentencing before a different district court judge. So "the appropriate remedy . . . is 'vacating [Warren's] sentence and remanding for resentencing before a different district court judge.'" *Ligon*, 937 F.3d at 721 (quoting *Fitch*, 282 F.3d at 368); *see also Barnes*, 278 F.3d at 649.

Of course, this remedy is not a reflection of the sentencing judge. *See Ligon*, 937 F.3d at 721; *see also Santobello*, 404 U.S. at 263. Still, it is "necessary for defendants to get the benefit of the bargain, and to preserve the appearance of an impartial judiciary—one that is not influenced by the prosecutor's previous breach." *Ligon*, 937 F.3d at 721. And *Santobello* and our precedent foreclose the government's argument that reassignment is unnecessary. *See id.*

III.

This is the second time we have vacated Warren's sentence for being a felon in possession of a firearm. We are thus remanding the case for a third sentencing. Hopefully the third time is the charm.

Warren's sentence is **VACATED** and his case **REMANDED** for resentencing before a different district court judge.

---

**CONCURRENCE**

---

NALBANDIAN, Circuit Judge.  I fully join the majority opinion.  I write separately to suggest that we should review the government's plea breaches for harmlessness.

Normally, after spotting a constitutional error during a criminal proceeding, we evaluate that error for harmlessness.  After all, "most constitutional errors can be harmless." *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991).  And Rule 52(a) of the Federal Rules of Criminal Procedure instructs us to disregard "[a]ny error, defect, irregularity, or variance that does not affect substantial rights."  Fed. R. Crim. P. 52(a).  Of course, there is a small class of "structural" errors that "defy analysis by 'harmless-error' standards." *Fulminante*, 499 U.S. at 309.  But plea breaches by the government do not belong to that class. *See Puckett v. United States*, 556 U.S. 129, 140–41 (2009).  So, in theory, because plea breaches are not structural errors, they should be subject to a harmlessness inquiry. *See Neder v. United States*, 527 U.S. 1, 7 (1999) (describing structural errors as "so intrinsically harmful as to require automatic reversal . . . without regard to their effect on the outcome" but noting that "[f]or all other constitutional errors, reviewing courts must apply Rule 52(a)'s harmless-error analysis").

But *Santobello* and its progeny complicate things.  Courts have read *Santobello* to mandate "automatic reversal . . . when objection to the Government's breach of a plea agreement has been preserved." *Puckett*, 556 U.S. at 141; *see also United States v. Barnes*, 278 F.3d 644, 648 (6th Cir. 2002) ("The harmless error rule does not apply to the law of contractual plea agreements." (quoting *United States v. Myers*, 32 F.3d 411, 413 (9th Cir. 1994))).  And the majority rule among our sister circuits is that plea breaches are not subject to a harmlessness inquiry. *See United States v. Purser*, 747 F.3d 284, 292 & n.34 (5th Cir. 2014) (noting that "[m]ost of our sister circuits have similarly rejected the use of a harmlessness inquiry in situations of a plea agreement breach where the error has been preserved" and collecting cases).

At the same time, some federal circuits, *Santobello* notwithstanding, have reviewed plea breaches for harmlessness. *See, e.g.*, *United States v. Diaz-Jimenez*, 622 F.3d 692, 695 (7th Cir.

2010) (recognizing that immaterial breaches do not require relief and saying "[w]e can't see the difference between calling a breach of a plea agreement a harmless error and calling it immaterial"); *United States v. Smith*, 584 F.3d 1127, 1129 (8th Cir. 2009) ("[E]ven if the government violated its agreement here, the breach was harmless and so could not be the basis for any relief to Mr. Smith."); *United States v. Amico*, 416 F.3d 163, 168 & n.3 (2d Cir. 2005); *United States v. E.V.*, 500 F.3d 747, 755 n.13 (8th Cir. 2007).

So there is confusion among our sister circuits over whether harmless-error review applies to the government's plea breaches. *Puckett* came close to explicitly answering that question "yes," but it stopped just shy of doing so. The Court held that plea breaches are not structural errors and do not defy analysis by harmless-error standards. *See Puckett*, 556 U.S. at 141. And as *Neder* notes, courts normally evaluate non-structural errors for harmlessness. 527 U.S. at 7. Likewise, the Court directly noted the possibility that *Santobello*'s "automatic-reversal rule" did not survive *Fulminante* and *Neder*. *Puckett*, 556 U.S. at 141 n.3. But at the same time, the Court repeated *Santobello*'s holding "that automatic reversal is warranted when objection to the Government's breach of a plea agreement has been preserved." *Id.* at 141.

Still, at the very least *Puckett* casts doubt on whether *Santobello* requires automatic reversal. And that's how several circuits see it too. The Seventh Circuit, for instance, views *Puckett* as "declar[ing] it an open question" whether harmlessness applies to prosecutorial plea breaches. *Diaz-Jimenez*, 622 F.3d at 695. So does the First Circuit, s*ee United States v. Melvin*, 730 F.3d 29, 38 n.3 (1st Cir. 2013), and the Eleventh, *see United States v. Feigin*, 365 F. App'x 180, 184 (11th Cir. 2010). And before the Court decided *Puckett*, the Eighth Circuit questioned "[w]hether the Supreme Court today would follow *Santobello*'s rejection of harmless-error analysis" under *Fulminante* and *Neder*. *See United States v. Mosley*, 505 F.3d 804, 811 (8th Cir. 2007). Of course, the federal circuits don't view *Puckett* uniformly. The Fifth Circuit, for instance, takes *Puckett* to mean the Court still reads *Santobello* as "foreclosing any harmless error analysis of a plea agreement breach." *Purser*, 747 F.3d at 293.

All that to say, there is some conflict among (and even within) the circuits over whether we should review government plea breaches for harmlessness. Of course, the majority rule is that we should not. But it's hard to square that with *Puckett* and with the fact that most courts of

appeals "have not taken the extreme position that *any* violation of a promise [in a plea agreement] . . . automatically requires reversal—that it can never be deemed minor or curable." *Diaz-Jimenez*, 622 F.3d at 694–95. In fact, our sister circuits have come up with several doctrines that mitigate the government's breach. For example, when a breach is immaterial, technical, minor, or cured, *see, e.g.*, *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014); *United States v. Vaval*, 404 F.3d 144, 155 (2d Cir. 2005), or where the relief the defendant seeks is impossible because he cannot possibly receive any other sentence, *see, e.g.*, *United States v. Belt*, 89 F.3d 710, 713 (10th Cir. 1996), relief is not required.

Most federal courts accept some or all these mitigating doctrines. But for the most part they insist that plea breaches by the government are not subject to any type of harmlessness review. *See, e.g.*, *Purser*, 747 F.3d at 292–93 (rejecting harmless error for plea breaches but recognizing a cure exception); *United States v. VanDam*, 493 F.3d 1194, 1204–05 (10th Cir. 2007) (rejecting harmless error for *material* plea breaches only and recognizing a legal-impossibility exception). This is strange. After all, is there really much daylight between a harmless breach and an immaterial one? Or a harmless breach and one the government cures? *See Diaz-Jimenez*, 622 F.3d at 695 ("We can't see the difference between calling a breach of the plea agreement a harmless error and calling it immaterial."). In other words, federal courts have done all they can to subject plea breaches to harmless-error review except apply the normal harmless-error standard.

This ritual is unnecessary. *Puckett*, drawing on *Fulminante* and *Neder*, all but holds that we should review plea breaches by the government for harmlessness. *See* 556 U.S. at 140–41 (noting that plea breaches are not structural, do not necessarily render criminal trials fundamentally unfair, and do not defy analysis by harmless error standards). And even if the Court stopped just short of endorsing harmless-error review for plea breaches, the analytical tools we need to review such breaches for harmlessness have existed for decades. Like I said, there isn't much daylight between an immaterial breach and a harmless one. The same is true for cured breaches, technical breaches, and so on. So federal courts already look at the things we would look at if we just dropped the fiction and applied harmlessness. Harmlessness would thus

unify the mitigating doctrines into a single analysis, simplifying review and making it more predictable.

We have not weighed in, at least in a published decision, on *Puckett*'s effect on the application of harmlessness to plea breaches. Our recent decision in *United States v. Ligon* reaffirms *Santobello* but doesn't cite *Puckett* or discuss whether it affects *Santobello*. *See* 937 F.3d 714, 718 (6th Cir. 2019); *see also United States v. Carter*, 814 F. App'x 1000, 1007 (6th Cir. 2020) (noting that "there is no 'harmless error' exception" to *Santobello* but not addressing *Puckett*). And we have not elaborated at length on our view of the mitigating doctrines that our sister circuits have adopted.

But this case does not present these issues directly. The government does not argue that its breach was harmless. In fact, at oral argument, the government conceded that it did not think harmless error analysis applies to plea breaches. Nor does the government advocate for the application of any of the several mitigating doctrines that our sister circuits have identified. So it forfeits those arguments. *See United States v. Johnson*, 467 F.3d 559, 564 (6th Cir. 2006).

That leaves us with this: The government breached Warren's plea agreement. And because the government concedes that it does not think harmlessness should apply, we must leave it for another day to determine whether *Puckett*, *Fulminante*, and *Neder* require us to apply harmless-error review to prosecutorial plea breaches.

For these reasons, I join the majority opinion.